**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| JUDITH WOODHAM | CIVIL ACTION NO. 24-0606 |
| VERSUS | JUDGE ALEXANDER C. VAN HOOK |
| BELLSOUTH TELECOMMUNICATIONS | MAGISTRATE JUDGE HORNSBY |

# MEMORANDUM RULING

Judith Woodham ("Woodham") broke an ankle when she stepped into a rut in her neighbor's yard. In her telling, Mills Utility Construction of MS, Inc. ("Mills) left the rut after it installed a utility handhole and fiber-optic cable for BellSouth Telecommunications LLC d/b/a AT&T Louisiana ("AT&T"). The defendants, Mills and AT&T, see it differently. They moved for summary judgment arguing Woodham has no proof that a hole existed, much less that Mills created it. AT&T also asserts that, even if Mills left the hole, it has no liability for Mills's negligence because Mills was an independent contractor. For the following reasons, AT&T is entitled to summary judgment and dismissal of the claims against it. But genuine disputes of material fact exist whether Mills dug and then abandoned an unbackfilled hole.

## Background

On October 23, 2023, Woodham and a contractor, Steven Smith, walked near her fence, inspecting for repairs. Record Document 113-3 at 32. Woodham lived at 9737 Catawba Drive, Shreveport, Louisiana, and her fence ran along the property

line with her neighbor, Lana Gilliam ("Gilliam"), who lived at 9741 Catawba Drive. *Id.* at 9, 41; Record Document 113-4 at 6.

To do their inspection, Woodham and Smith walked on Gilliam's side of the fence. Record Document 113-3 at 41. Near the place where the fence started, Woodham "stepped through the grass that had grown, stepped through that grass into one of the ruts and fell over." *Id.* at 32. At that moment, she "heard a bone snap." *Id.* at 33. Woodham suffered a fractured ankle from the fall, requiring multiple surgeries. *See id.* at 62; Record Document 120-1 at 15.

Smith and Gilliam corroborated Woodham's recollection of a hole. Smith testified that Woodham "fell in a hole that she could not see. The grass had grown up around it…the ground was just real unstable there." Record Document 113-7 at 14. Smith recalled that her leg was "cocked on the side. Like you could tell instantly it was broken. It was broken bad." *Id.* Gilliam also saw the hole Woodham fell into, saying: "It looked like a hole. The grass had, you know, grown a little bit, but you could tell." Record Document 113-4 at 12.

Woodham believed that Mills made (then left) the hole months earlier. In March 2023, Woodham recalled that a construction crew installed fiber-optic cable near the place where she fell. Record Document 113-3 at 44, 45. Woodham saw the crew had a "trencher-type equipment with fairly wide wheels on it." *Id.* at 72. That equipment had been sitting "in the area that was all rutted up" where she fell. *See id.* Woodham said that before construction the land had been "smooth and level" but after it became "rutted up and holey." *Id.* at 32.

Woodham testified that the construction crew belonged to Mills. Although she acknowledged some uncertainty about the crew's affiliation, Woodham explained that she thought Mills ran the crew because they told her as much. Woodham said she confronted the crew about not repairing the land, and they gave her a business card that said Mills. *See* Record Document 113-3 at 54, 56. Woodham also recalled that "[t]hey may have told me they were from Mills." *Id.* at 36.

Mills and AT&T also acknowledged that Mills performed work at 9737 and 9741 Catawba Drive, the place Woodham fell. *See, e.g.*, Record Document 113-8 at 21, 34, 35. Mills had a contract to bore for fiber-optic cable and install utility handholes. *Id.* at 20; Record Document 113-5 at 39. And Mills installed a handhole near the place where Woodham stepped into a rut. *Id.* ("We place all the fiber and set all the boxes, the handholes.").

As part of their contract, AT&T provided Mills with a "design of the fiber layout" that showed where the handholes and fiber cable should be placed. Record Document 113-5 at 13. Other than the design layout, though, AT&T had little involvement with Mills's operations. AT&T performed sporadic "spot checks" of Mills's work to ensure it met their quality standards and made sure Mills fixed any problems, including restoring the land it disturbed. Record Document 113-8 at 22, 25. Otherwise, Mills used its own equipment, hired its own workers, supervised itself, and had been responsible for deciding how to perform the boring and restoration work. *Id.* at 16, 39, 40; Record Document 113-5 at 15.

Relying on the design layout, Mills insists that it did not work near the specific patch of ground where the dangerous hole had been. *See, e.g.*, Record Document 113-1 at 10. According to Mills, the design layout called for boring along the rear of the property, not the property line where the accident occurred, and they did not deviate from the design layout. *See* Record Document 113-5 at 35. However, the owner of Mills who testified on its behalf also acknowledged that he had no specific recollection of the work done at 9737 and 9741 Catawba Drive. *Id.* at 36. Mills also admitted that they would bore along the property line to install a handhole when, like here, the utility easement sat elsewhere on a property. *Id.* at 32, 40.

**Standard**

Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When the burden at trial will rest on the nonmovant, the movant need not produce evidence to negate the elements of the nonmovant's case; rather, it need only point out the absence of supporting evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant satisfies its initial burden, the nonmovant must demonstrate a genuine dispute exists by "going beyond the pleadings" and "designating specific facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). This burden requires more than metaphysical doubt, conclusory or unsubstantiated allegations, or a mere scintilla of evidence. *Id.*

## Analysis

In a diversity case, like this one, federal courts apply state substantive law. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). In Louisiana, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. To determine liability, Louisiana courts employ a duty-risk analysis and require a plaintiff to prove five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008).

Here, genuine disputes of material fact exist whether Mills left an open hole that broke Woodham's ankle.

First, Woodham offered more than an "unsubstantiated allegation" that a rut near the handhole Mills installed caused her fall. Woodham testified: "I stepped through the grass that had grown, stepped through that grass into one of the ruts and fell over." Record Document 113-3 at 32. The fencing contractor, Smith, and her neighbor, Gilliam, corroborated her testimony. Smith said that the ground had been "kind of rough" and "really choppy," and "[t]here was a hole. I don't know like what other word you could describe it [with] other than a hole." Record Document 113-7 at 21, 27. Gilliam said the same, testifying that she "saw the hole afterwards[,]" and "[i]t

looked like a hole. The grass had…grown a little bit, but you could tell." Record Document 113-4 at 12.

The photographs Woodham took show how close the disturbed land had been to the AT&T handhole. In the following photographs, the "x" marks the spot where the disturbed land had been and where Woodham fell. Record Document 113-3 at 44. And Mills admitted that the handhole "looks like" what it installed and that it "place[d] all the fiber and set all the boxes, the handholes." Record Document 113-5 at 39.





Second, Woodham has enough evidence to show that Mills created the hole that broke her ankle. Woodham testified that before Mills installed fiber-optic cable and a utility box it had been "smooth and level." Record Document 113-3 at 36. But after the construction, the land had been "rutted up and holey." *Id.*

Although the defendants argued that some other entity, not Mills, did the construction, Woodham testified that it had been Mills. Woodham said she believed

the construction crew belonged to Mills because "[t]hey may have told me they were from Mills[,]" and she also thought that "they gave me a business card[.]" *Id.* at 36, 54, 59-60 ("I told you that I believe he gave me a card and it indicated that he was with Mills construction.").Woodham's testimony alone would have been enough to create a genuine dispute of material fact. S*ee, e.g.*, *Guzman*, 18 F.4th at 161 ("[S]elf-serving evidence is sufficient to create a genuine issue of material fact[,]"), but she offered more.

Mills testified through its corporate representative that it had likely installed the utility box where Woodham fell. Record Document 113-5 at 39 (admitting that "the [box] in the very back looks like the ones we set[,]" and that "[w]e place all the fiber and set all the boxes[.]"). Although Mills claimed it had worked only near the back of the property, and not on the property line where Woodham fell, its representative undercut that claim. Mills admitted in its corporate deposition that it would bore along a property line to reach utility boxes, like the one where Woodham fell, when they did not have an easement to follow. Record Document 113-5 at 32.

Mills's arguments supporting summary judgment are not persuasive. Mills makes much ado about Woodham not pinpointing the precise location of the hole or measuring the hole. *See, e.g.*, Record Document 121 at 1 ("Where exactly was the hole Judith Woodham claims she stepped into?"). But, at this stage, those purported failures relate to the weight of her evidence. *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) ("[C]ourts may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes.").

Mills's other argument, that Woodham's claim sounds in premises liability, fares no better. Woodham alleges that Mills acted negligently when it took an affirmative action, digging a hole and leaving it unfilled, and not that Mills had custody of the defective property. As Woodham eloquently put it, "[a] contractor who bores a hole and leaves it unfilled is answerable for that conduct…whether or not it owns or holds [custody] of the land." Record Document 120 at 21. Moreover, even if this action concerned premises liability, the duty risk analysis remains the same. *Farrell v. Circle K Stores, Inc.*, 359 So.3d 467, 473 (La. 2023) ("Whether a claim arises in negligence under La. Civ. Code art. 2315 or in premises liability under La. Civ. Code art. 2317.1, the traditional duty/risk analysis is the same…[and] the result under either should be the same.").

Although Mills is not entitled to summary judgment, AT&T is. Louisiana has a "general rule that a principal is not liable for the negligent acts of an independent contractor acting pursuant to the contract." *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). That rule has limits, and a principal may be liable when it "retains operational control over the independent contractor's acts or expressly or impliedly authorizes those acts." *Id.*

The United States Court of Appeals for the Fifth Circuit has addressed operational control under Louisiana law and set a high bar. "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 613 (5th Cir. 2018).

Here, Woodham has seemingly conceded that AT&T did not have operational control over Mills because she did not argue it. *See generally* Record Document 120 at 18. She ignored the argument for good reason—AT&T did not exert "control over the operative detail of doing any part of the work." *Renwick*, 901 F.3d at 613. AT&T did not supervise Mills, tell Mills how to bore or restore the land, and none of its employees worked with Mills's crew in the field. Although AT&T retained the ability to inspect Mills's work and could prescribe fixes, the Fifth Circuit requires more than that to find operational control. *Id.* ("It is not enough…that the principal has merely a general right…to inspect its progress or to receive reports…or to prescribe alterations or deviations.").

Instead, Woodham claims that AT&T had an independent duty to restore the land that its independent contractor disturbed. Record Document 120 at 19. Woodham supports her argument with a Louisiana appellate court decision, *Shephard v. AIX Energy, Inc.*, 249 So.3d 194 (La. App. 2 Cir. 2018), and argues a principal contractor remains liable for its own negligent acts. *Id.* This argument is unavailing. *Shephard* did not address operational control, and the alleged negligent actions in this case—digging a hole and leaving it unfilled—stem from the actions of AT&T's independent contractor, Mills, and not its own negligence. Therefore, AT&T is entitled to summary judgment.

**Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Mills and its insurer, Union Insurance Company, Record Document 113, is DENIED. The

motion for summary judgment filed by AT&T is GRANTED, and all claims against it are dismissed with prejudice.

**DONE AND SIGNED** at Shreveport, Louisiana, this 17th day of August, 2026.

ALEXANDER C. VAN HOOK
UNITED STATES DISTRICT JUDGE